IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID SCHKLOVEN,
    *Plaintiff*,

    v.

    Civil Action No. ELH-21-0600

HARTFORD LIFE AND ACCIDENT
INSURANCE CO.,
    *Defendant*.

**MEMORANDUM OPINION**

This case arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* Pursuant to 29 U.S.C. §1132(a), plaintiff David Schkloven contends that defendant Hartford Life and Accident Insurance Co. ("Hartford") wrongfully terminated his long term disability ("LTD") benefits, which he received through a group disability income policy (the "Policy," the "Plan," or the "LTD Policy") issued by defendant to plaintiff's employer, CSRA, Inc. ("CSRA").[1]   ECF 1 (the "Complaint").

Schkloven asks the Court to "[d]eclare and determine Plaintiff's rights under the terms of the LTD Policy, including without limitation his right to the payment of disability income benefits which have accrued on and after 12/29/2017[.]"  *Id.* at 3.  He also seeks a "monetary judgment" against Hartford for disability income benefits that have accrued since December 29, 2017.  *Id.*  In particular, he seeks payment of monthly benefits of $7,409.16 for 30.3 months, for a total of $224,497.55.  ECF 21-1 at 16.  Plaintiff also asks the Court to award pre-judgment interest and costs as well as reasonable attorneys' fees, in accordance with 29 U.S.C. § 1132.  *Id.*

---

[1] The Record refers to plaintiff's employer as "CSRA," "CSRA/CSC," and "CSC".  *See* ECF 14-6 at 60, 67.  The parties do not explain the discrepancy.

Hartford answered the Complaint and asserted a counterclaim (the "Counterclaim," ECF 7), supported by one exhibit.  ECF 7-1.  In the Counterclaim, Hartford contends that, pursuant to the Policy, it is entitled to recover for the overpayment of LTD benefits, based on plaintiff's receipt of Social Security disability benefits ("SSD Benefits").  ECF 7 at 5-6, ¶¶ 5-15.

Cross motions for summary judgment are pending.  Schkloven has moved for summary judgment as to his ERISA claim (ECF 21), accompanied by a memorandum.  ECF 21-1 (collectively, the "the Motion").  Hartford has filed a combined opposition to the Motion and a cross motion for summary judgment as to plaintiff's ERISA claim and as to the Counterclaim (ECF 22), supported by a memorandum.  ECF 22-1 (collectively, the "Cross Motion").[2]  Plaintiff opposes the Cross Motion.  ECF 23.  Hartford has replied.  ECF 25.  The parties have also submitted a copy of the administrative record.  *See* ECF 14-1; ECF 14-2; ECF 14-3; ECF 14-5; ECF 14-6 (collectively, the "Record").[3]

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion and I shall grant the Cross Motion in part and deny it in part.

## I.    Factual Background[4]

### A.

---

[2] The Cross Motion expressly references a document titled "Exhibit 1."  *See* ECF 22-1 at 19.  But, no exhibit was appended to the Cross Motion.  However, defense counsel later docketed the exhibit, explaining that she "inadvertently omitted [it] from the original filing."  ECF 24; *see* ECF 24-1.

[3] At Hartford's request (ECF 16), and by Order of August 19, 2021 (ECF 17), the Record was filed under seal.

[4] The Factual Background is drawn from the Motion, the Cross Motion, and the Record. The parties' briefing employs Bates numbers to cite to documents contained in the Record.  *See*, *e.g.*, ECF 22-1 at 3 n.1.  Instead, I shall cite to the Record by its electronic pagination.  However, the electronic pagination does not necessarily correspond to the page number imprinted on a given filing.

At the relevant time, Schkloven was an employee of CSRA. *See* ECF 14-6 at 60.[5] Through his employment, plaintiff participated in the "CSRA INC. Fully-Insured Employee Welfare Benefits Plan." ECF 14-1 at 36.[6] It is a "Welfare Benefit Plan providing Group Long Term Disability," and it is governed by ERISA. *Id.* The Policy identifies "CSRA, INC." as the "Plan Administrator." *Id.* And, Hartford is "designated and named . . . as the claims fiduciary for benefits provided under the Policy." *Id.* The Plan reserves to Hartford the "full discretion and authority to determine eligibility for benefits and [the right] to construe and interpret all terms and provisions of the Policy." *Id.* at 38.

Pertinent here, the Policy provides "long term income protection" to a claimant in the event that a claimant "become[s] Disabled from a covered injury, sickness or pregnancy." *Id.* at 10.[7] A claimant qualifies as disabled where, *id.* at 24:

> [The claimant is] prevented from performing one or more of the Essential Duties of:
>
> 1) [The claimant's] Occupation during the Elimination Period;
>
> 2) [The claimant's] Occupation, for the 24 months following the Elimination Period; and as a result [the claimant's] Current Monthly Earnings are less than 80% of [the claimant's] Indexed Pre-disability Earnings; and
>
> 3) after that, Any Occupation.

---

[5] The Record is unclear as to the date on which plaintiff was first hired by CSRA. Plaintiff's portion of the "Application For Long Term Disability Income Benefits" (the "Application") indicates that he was hired in October 2009. ECF 14-6 at 60 (emphasis omitted). But, the employer section of the Application provides that plaintiff was not hired until October 25, 2010. *Id.* at 65. The discrepancy is not material to the parties' claims.

[6] Defendant refers to the Policy as the "CSRA Inc. Fully-Insured Employee Welfare Benefits Plan ('Plan') for Employees of Booz Allen." ECF 22-1 at 3.

[7] The Policy uses the terms "We", "Our", and "Us" to reference Hartford, and the terms "You" and "Yours" to refer to claimants, such as plaintiff. ECF 14-1 at 27.

Under the Policy, "Elimination Period" is defined, in relevant part, as "the number of consecutive days at the beginning of any one period of Disability which must elapse before benefits are payable[.]" ECF 14-1 at 24. Here, the Elimination Period is 180 consecutive days. *Id.* at 10. Further, the claimant's disability must arise from "accidental bodily injury"; "sickness"; "Mental Illness"; "Substance Abuse"; or "pregnancy." *Id.* at 24.

An "Essential Duty" is defined as one that is "substantial, not incidental"; "fundamental or inherent to the occupation"; and "cannot be reasonably omitted or changed." *Id.* For instance, the Policy provides that a claimant's "ability to work the number of hours in [the claimant's] regularly scheduled workweek is an Essential Duty." *Id.*

Moreover, the Policy provides a detailed process to which claimants must adhere in order to obtain long term disability benefits. The claimant must provide Hartford "written notice of a claim within 30 days after Disability or loss occurs." *Id.* at 19. Hartford will then "send forms to [the claimant] to provide Proof of Loss, within 15 days of receiving a Notice of Claim." *Id.* at 20. Among other things, Proof of Loss includes documentation of "the date [the claimant's] Disability began"; "the cause of [the claimant's] Disability"; "the prognosis of [the claimant's] Disability"; the claimant's "Pre-disability Earnings, Current Monthly Earnings or any income"; and "evidence that [the claimant is] under the Regular Care of a Physician." *Id.*

The "Written Proof of Loss must be sent to [Hartford] within 90 days following the completion of the Elimination Period." *Id.* And, the Policy reserves to Hartford the right to "request Proof of Loss throughout [the claimant's] Disability, as reasonably required." *Id.* The claimant must provide "the proof within 30 day(s) of the request." *Id.* And, in the event that

Hartford determines that a claimant no longer qualifies as disabled, the Policy specifies that benefit payments cease, effective as of the date on which the claimant ceases to qualify.  ECF 14-1 at 17.[8]

Moreover, the Policy includes a "Maximum Duration of Benefits Table".  *Id.* at 11.  It sets forth a schedule of the maximum length of time that a claimant may receive long term disability benefits, in accordance with the claimant's "Age When Disabled," as follows, *id.* (boldface in original):

| Age When Disabled | Benefits Payable |
|---|---|
| Prior to Age 63 | To Normal Retirement Age or 42 months, if greater |
| Age 63 | To Normal Retirement Age or 36 months, if greater |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |
| Age 67 | 18 months |
| Age 68 | 15 months |
| Age 69 and over | 12 months |

"Normal Retirement Age" is defined in the Policy to mean "the Social Security Normal Retirement Age as stated in the 1983 revision of the United States Social Security Act.  It is determined by [the claimant's] date of birth as follows," *id.*:

| Year of Birth | Normal Retirement Age |
|---|---|
| 1937 or before | 65 |
| 1938 | 65 + 2 months |
| 1939 | 65 + 4 months |
| 1940 | 65 + 6 months |
| 1941 | 65 + 8 months |
| 1942 | 65 + 10 months |
| 1943 thru 1954 | 66 |
| 1955 | 66 + 2 months |
| 1956 | 66 + 4 months |
| 1957 | 66 + 6 months |
| 1958 | 66 + 8 months |
| 1959 | 66 + 10 months |
| 1960 or after | 67 |

---

[8] The LTD Policy contemplates a series of circumstances in which benefits may be terminated prior to the date on which a claimant no longer qualifies as disabled, none of which are relevant here.  *See* ECF 14-1 at 17.

Under the terms of the Policy, a claimant's gross monthly LTD benefit is calculated by multiplying his monthly income loss by the "Benefit Percentage."  ECF 14-1 at 16.  Hartford provides participants with three "Benefit Percentage" options from which to choose: 40%, 50%, or 60%.  *Id.* at 10.  Hartford also requires claimants to elect a "Maximum Monthly Benefit" that the claimant could receive, either $5,000 or $18,500.  *Id.* [9]

To calculate the claimant's monthly benefit, the claimant's monthly income loss is multiplied by the benefit percentage.  Hartford "compare[s] the result with the Maximum Benefit" elected by the claimant, and "from the lesser amount, deduct[s] Other Income Benefits."  *Id.* at 16. The amount remaining is the monthly benefit paid to the claimant, provided, however, that the amount of the benefit does not fall below the "Minimum Monthly Benefit," which the Policy defines as the greater of $100 or "10% of the benefit based on Monthly Income Loss before the deduction of Other Income Benefits."  *Id.* at 10.

"Other Income Benefits" is defined as "the amount of any benefit for loss of income, provided to [the claimant or the claimant's] family, as a result of the period of Disability for which [the claimant is] claiming benefits under The Policy."  *Id.* at 25.  "This includes any such benefits for which [the claimant] or [the claimant's] family are eligible or that are paid to [the claimant] or [the claimant's] family, or to a third party on [the claimant's] behalf[.]"  *Id.*  Relevant here, the Policy expressly defines "Other Income Benefits" to include disability benefits that a claimant

---

[9] The Policy states that claimants "must contribute toward the cost of coverage."  ECF 14-1 at 10.  It also provides, *id.* at 37: "The Employer pays the premium for the insurance, but may allocate part of the cost to the employee, or the employee may pay the entire premium.  The Employer determines the portion of the cost to be paid by the employee."  On the other hand, Hartford "determines the cost according to the rate structure reflected in the Policy of Incorporation."  *Id.*

receives pursuant to "the United States Social Security Act or alternative plan offered by a state or municipal government."  ECF 14-1 at 25.

Moreover, the Policy reserves to Hartford "the right to recover from [the claimant] any amount that [Hartford] determine[s] to be an overpayment" and, within 30 days of any request, the claimant has "the obligation to refund to [Hartford] any such amount."  *Id.* at 22.  The LTD Policy states that "[a]n overpayment occurs . . . when [Hartford] determine[s] that the total amount [Hartford] ha[s] paid in benefits is more than the amount" due to the claimant under the terms of the Policy or "when payment is made by [Hartford] that should have been made under another group policy."  *Id.*  Notably, Hartford's right to recover overpayments encompasses any "overpayments resulting from . . . retroactive awards received from sources in the Other Income Benefits definition[.]"  *Id.*  If a claimant does not timely reimburse Hartford, then Hartford may, among other things, "pursue and enforce all legal and equitable rights in court."  *Id.*

Pertinent here, the Policy requires a claimant to "apply for Social Security disability benefits when the length of [the claimant's] Disability meets the minimum duration required to apply for such benefits," and within "45 days from the date of [Hartford's] request."  *Id.* at 21.  And, Hartford "reserve[s] the right to reduce [the claimant's]  Monthly Benefit by estimating the Social Security disability benefits [the claimant or the claimant's] spouse and children may be eligible to receive."  *Id.*  Thus, "if [the claimant's] Social Security benefits were higher than [Hartford] estimated, and if [the claimant's] Monthly Benefit has been overpaid, [the claimant] must make a lump sum refund to [Hartford] equal to all overpayments, in accordance with the Overpayment Recovery provision."  *Id.*

The Plan also sets forth the way in which a claimant may seek redress in the event a claim for benefits is denied.  It states: "If a claim for benefits is wholly or partly denied, [the claimant]

will be furnished with written notification of the decision," which will "give the specific reason(s) for the denial"; "make specific reference to The Policy provisions on which the denial is based"; "provide a description of any additional information necessary to perfect a claim and an explanation of why it is necessary"; and "provide an explanation of the review procedure."  ECF 14-1 at 21.  And, a claimant may appeal any denial to Hartford "for a full and fair review" by requesting "a review upon written application" within certain enumerated timeframes.  *Id.*  The claimant may also "request copies of all documents, records, and other information relevant to [the] claim" and "submit written comments, documents, records and other information relating to [the] claim."  *Id.*

After exhausting administrative remedies, the Policy advises that a claimant may seek judicial review of Hartford's decision in state or Federal court.  *See id.* at 38.  But, it also indicates: "Legal action cannot be taken against [Hartford] . . . more than 3 years after the date Proof of Loss is required to be given" to Hartford, in accordance with the terms of the LTD Policy.  *Id.* at 22-23.

**B.**

Plaintiff was born in July 1953.  *See* ECF 14-5 at 35 (noting plaintiff's date of birth).  He was employed by CSRA as "Senior Principal: System Architect."   ECF 14-6 at 67.  In this role, plaintiff "[p]rovide[d] account team support for highly complex projects/programs . . . for the bid process and the planning, design, implementation, and support to ensure the information technology (IT) solutions strategy and architecture align with business strategy."  *Id.*  He worked in a full time capacity, *i.e.*, 8 hours per day for 5 days a week.  *See* ECF 14-5 at 51.

According to an "Occupational Analysis Report" (ECF 14-2 at 82-84) (the "OA Report"), completed by Hartford on December 14, 2017, Schkloven's work involved "Sitting for 7 hours at one time up to 7 total hours during a typical workday"; "Standing for [one] half-hour at one time

up to a half-hour total during a typical day"; "Walking up to [one] half-hour at one time, up to a half-hour total during a typical workday"; "Occasional below waist level reaching and bilateral handling"; "Frequent reaching at waist/desk level"; and "Constant bilateral fingering".  ECF 14-2 at 83.

In light of these required tasks, the OA Report indicated that plaintiff's job was consistent with "sedentary duty," as defined by the Department of Labor.  *Id.* at 82.[10]   Notably, "sedentary duty" requires, among other things, "exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body."  *Id.* at 83.  Further,  according to the OA Report, "[s]edentary work involves sitting most of the time, but may involve walking or standing for brief periods of time."  *Id.* at 83-84.[11]  Thus, "[j]obs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."  *Id.* at 84.

In March 2016, Schkloven injured his back while "moving and lifting boxes" at home.  ECF 14-6 at 61.  An "MRI of the Lumbosacral Spine Without Contrast" completed on March 17, 2016, revealed that plaintiff suffered from, among other things, "Mild disc degeneration"; "Bilateral stress fractures"; and a "Large central disc herniation and marked facet arthrosis."  *Id.* at 25-26 (emphasis omitted).[12]

---

[10] The OA Report refers to "regulations" promulgated by the Department of Labor as well as "D.O.T. requirements."  ECF 14-2 at 83-84.   However, the OA Report does not specify the "regulations" or "requirements" that it considered.  Further, the OA Report does not define the term "D.O.T."  And, as best I can determine, the term does not appear elsewhere in the Record. But, in context, "D.O.T." appears to pertain to the Department of Labor.

[11] The difference between "sedentary duty" and "[s]edentary work" is not readily apparent.

[12] The parties do not define the term "MRI."  But, to my knowledge, it is an abbreviation for magnetic resonance imaging.  *See Passalaqua v. Bell*, TDC-2940, 2021 WL 662250, at *2 (D. Md. Feb. 19, 2021).

On April 25, 2016, plaintiff sought nonsurgical treatment for his injury from Mark Coleman, M.D., a pain management specialist.  *See* ECF 14-6 at 61; *see also* ECF 14-5 at 34-48 (treatment notes from Dr. Coleman).[13]  However, nonsurgical treatment eventually proved to be unsuccessful.  *See* ECF 14-6 at 20 (noting that nonsurgical measures had failed).

On February 3, 2017, plaintiff stopped working.  ECF 14-2 at 41.[14]  At that time, Schkloven was sixty-three years of age.  *See* ECF 14-5 at 35.  Approximately five days later, on February 8, 2017, Schkloven consulted Mesfin A. Lemma, M.D., an orthopedic surgeon, complaining of "dull ache sharp stabbing pain in the low back that radiates down . . . to his knees."  ECF 14-6 at 23.  Consistent with plaintiff's MRI results, Dr. Lemma determined that plaintiff suffered from "Degeneration of intervertebral disc of lumbar region" and "Spinal stenosis, lumbosacral region." *Id.*  Dr. Lemma "offered operative intervention, as [plaintiff] has exhausted all nonsurgical measures including therapy as well as spinal injections."  *Id.* at 22.

Dr. Lemma operated on plaintiff on March 21, 2017.  He performed "Posterior spinal arthrodesis, L4-L5"; "Posterior spinal segmental instrumentation with pedicle screw fixation, L4-L5"; "Bilateral nerve root decompression, L4 and L5"; "Application of local autologous bone graft, one level, L4-L5"; and "Application of morselized allograft, one level, L4-L5."  *Id.* at 20 (notes from surgery).

---

[13]  The Record reflects that plaintiff received treatment from a physician named Stanford Malinow on March 20, 2016.  *See* ECF 14-6 at 61-62.  The Court has not been presented with any information indicating whether Dr. Malinow treated plaintiff after this date.

[14]  Although there was confusion regarding the exact date on which Schkloven stopped working, Hartford ultimately determined that the relevant date was February 3, 2017.  *See* ECF 14-6 at 43-44 (highlighting the discrepancy regarding the date on which plaintiff stopped working); ECF 14-2 at 41-42 (confirming that plaintiff stopped working on February 3, 2017).

Schkloven had a follow-up appointment with Dr. Lemma on June 21, 2017.  ECF 14-6 at 10-11.  Dr. Lemma observed: "David presents with persistent problems."  *Id.* at 10  Dr. Lemma noted that plaintiff had undergone a "spinal injection with good relief of his pain."  *Id.*  But, Schkloven had begun to experience "recent onset right foot weakness."  *Id.*  Further, Dr. Lemma wrote that  Schkloven was, as of June 21, 2017, "3 months postop with partial loss of fixation on his L4 pedicle screws and worsening symptoms including right foot weakness."  *Id.*  Accordingly, Dr. Lemma recommended that plaintiff undergo "revision surgery."  *Id.*

An MRI completed on the following day, June 22, 2017, confirmed, *inter alia*, that plaintiff continued to suffer from "Moderate central spinal stenosis at the level of maximum disk protrusion and moderately severe and moderate left foraminal stenosis"; "Mild central spinal stenosis L3-L4 with moderately severe right foraminal stenosis, right foraminal disk protrusion and trace degenerative spondylolisthesis L3 on L4"; and "Very mild degenerative retrolisthesis."  *Id.* at 9 (MRI results).

Also on June 22, 2017, Dr. Lemma completed an "Attending Physician's Statement" ("APS").  *Id.* at 56-57.  The APS reflected that Schkloven could not sit for more than an hour at a time or lift over ten pounds occasionally, and that Dr. Lemma expected these limitations to last for six months.   *Id.* at 57.  Dr. Lemma completed another APS on July 25, 2017, which reflected similar limitations.  *See id.* at 3-4 (showing, among other things, that plaintiff could sit for up to one hour at one time and lift up to ten pounds occasionally).  And, Dr. Lemma expected plaintiff's restrictions to persist for six months.  *Id.* at 4.

11

On an unspecified date, plaintiff began to receive short term disability benefits through his employer.  *See* ECF 14-6 at 62.  And, on July 17, 2017, an application for long term benefits was submitted to Hartford for plaintiff.  *Id.* at 55, 59.[15]

Effective August 5, 2017, Hartford awarded LTD benefits to plaintiff.  *See* ECF 14-2 at 42-46 (the "Award").[16]  Plaintiff was notified by letter dated August 9, 2017.  *Id.* at 42.  Because Schkloven had a monthly income loss of $12,349.60, and a benefit percentage of 60%, his gross monthly benefit was $7,409.76.  *Id.* at 46.  Notably, plaintiff was paid without any reductions for Other Income Benefits.  *Id.*

In the Award, Hartford stated that it would "require regular medical updates throughout the duration of [Schkloven's] claim."  *Id.* at 44.  It explained, *id.*: "Updated medical information and restrictions and limitations will need to be obtained from [Schkloven's] providers."  The purpose was to determine if Schkloven would "continue to meet the provisions of the LTD policy and remain eligible for continued benefits."  *Id.*

Significantly, Hartford said, *id.*: "Our records show that you have already applied for Social Security Disability (SSD) Benefits.  However, we are still waiting for you to provide us with proof of your application.  Please forward this to our office ASAP."[17]  Hartford also reminded plaintiff

---

[15] Schkloven signed the employee portion of the application for long term disability benefits on June 23, 2017.  *See* ECF 14-6 at 60-64.  However, CSRA was required to complete the employer portion of the application before it could be transmitted to Hartford.  *See id.* at 65-66; *see also id.* at 55, 58-59.

[16] Hartford initially indicated that plaintiff's long term disability benefits were effective as of August 7, 2017.  ECF 14-2 at 46.  But, based on further documentation provided by Dr. Coleman, Hartford revised the Award so that plaintiff's benefits were effective as of August 5, 2017.  *Id.* at 41.  This was communicated to plaintiff by letter dated August 28, 2017.  *Id.*

[17] The parties have not directed the Court's attention to any evidence showing that Schkloven ever submitted proof of this application to Hartford.  However, as discussed, *infra*, the Social Security Administration eventually awarded disability benefits to plaintiff, which he began to receive in January 2018.  *See* ECF 24-1 at 2.

12

to forward a copy of any decision rendered by the Social Security Administration ("SSA"), so that Hartford could adjust the amount of plaintiff's benefit award accordingly.  *See* ECF 14-2 at 44. And, the Award reiterated, *id.*: "If you are awarded Social Security Disability benefits a sizable overpayment of your LTD benefits could result.  Your signature on the LTD Payment Options Form indicates your agreement to immediately provide lump sum reimbursement for such an overpayment."  *Id.*

According to Hartford, plaintiff executed an agreement "to reimburse Hartford for any overpayment of LTD benefits caused by an award of SSD benefits."  ECF 22-1 at 19.  The Record includes a scanned copy of an agreement titled "LTD Payment Options and Reimbursement Agreement for Social Security Benefits," which appears to contain plaintiff's signature.  ECF 14-6 at 37-38 (the "Reimbursement Agreement").  However, the quality of the Reimbursement Agreement is too poor for the Court to discern the precise text, including the date on which the Reimbursement Agreement was executed.[18]  Nonetheless, plaintiff has not disputed that he entered into an agreement with Hartford that obligated him to reimburse Hartford under certain circumstances.

On August 22, 2017, plaintiff underwent "revision surgery" performed by Dr. Lemma to replace pedicle screw instrumentation that had become loose.  *See* ECF 14-5 at 22-23.  The surgery was completed without any complications.  *See id.* at 23 (noting that "[t]here were no complications" and "[t]he patient was transferred to the recovery room in good condition").

Approximately two weeks later, on September 5, 2017, plaintiff had a follow-up appointment with Dr. Lemma's physician assistant, Stephen Harris.  *See* ECF 14-5 at 20-21.  Harris

---

[18] Under Local Rule 102.2(c), "[n]o document shall be accepted for filing unless it is legible."

noted that plaintiff was "doing better"; his "right leg pain has improved"; "the strength in his right ankle . . . has also improved"; and "[t]he incision was healing well."  ECF 14-5 at 20.  Further, Harris observed that although Schkloven was "taking oxycodone as well as Flexeril for pain," Schkloven did "not feel that he needs anything long-acting at this time."  *Id.*

However, on September 27, 2017, Dr. Lemma completed another APS, which indicated that plaintiff remained unable to sit continuously for more than one hour and could not bend, kneel, climb, balance, drive, or lift any amount of weight.  *See id.* at 17-18.[19]  Dr. Lemma also noted that Schkloven was "Recovering From Revision Lumbar Fusion" and expected that plaintiff's limitations would persist for another six months.  *Id.* at 18.  Thus, Dr. Lemma indicated that Schkloven would be unable to return to work until February 22, 2018.  *Id.*

Following Schkloven's next visit with Dr. Lemma on October 4, 2017, Dr. Lemma reported that Schkloven "still has quite a bit of low back pain" but "[f]unctionally he is doing better."  *Id.* at 6.  In particular, Dr. Lemma indicated that Schkloven was "able to walk around his neighborhood" and "sit upright which he was not able to do preoperatively."  *Id.*  Schkloven also reported that he felt "his strength has improved."  *Id.*  Moreover, Dr. Lemma wrote: "Physical therapy has discontinued the home visits."  *Id.*

According to Dr. Lemma, X-rays showed that the new screws were "stable" and that alignment was "well maintained."  *Id.*; *see id.* at 8 (request for X-rays).  Dr. Lemma instructed Schkloven to use a "back brace for walking long distances," and to continue with the use of a "bone stimulator" as well as pain medications.  *Id.* at 6.

_____

[19] Schkloven indicates that this APS was completed on September 15, 2017.  ECF 21-1 at 4.  The Record reflects, however, that it was based on plaintiff's office visit on September 5, 2017, and was thereafter completed on September 27, 2017.  ECF 14-5 at 18.  The discrepancy is not material.

At Hartford's request, Dr. Lemma and Mr. Harris completed a "Provider Activity Level Report" on October 11, 2017. *See* ECF 14-5 at 2 (the "Activity Report"); *id.* at 4 (letter of October 11, 2017, asking Dr. Lemma to "complete the enclosed Provider Activity Level Report" and "validate how long any restrictions or limitations are in place and what is the expected return to work date if your patient is not yet released from work"). The Activity Report indicated that Schkloven was capable of sedentary functional activity, which it described as "Mainly sitting"; "Walking or standing for brief periods", and "Frequent handling, fingering and extending arms at desk level." *Id.* at 2. However, Dr. Lemma and Mr. Harris indicated that Schkloven could not bend, lift, or twist, as he was "Recovering From Revision spine surgery." *Id.*

Thereafter, by letter dated October 19, 2017, Hartford terminated plaintiff's long term benefit, effective October 19, 2017. ECF 14-2 at 28-32. Marissa Alvarez, a Hartford "Specialty Analyst," wrote, *id.* at 28, 31:

> We have completed our review of your claim for benefits and have determined that you do not meet the policy definition of Disability beyond 10/18/2017. Because of this, Long Term Disability (LTD) benefits are not payable to you as of 10/19/2017.
>
> * * * * *
>
> Dr. Lemma completed a Provider Activity Level Report on 10/11/2017 confirming that you are functionally capable of performing full time sedentary work (which involves lifting occasionally up to 10 pounds or negligible amount, mainly sitting, walking or standing for brief periods and frequent handling, fingering and extending arms at desk level.) He further advised you were not to do any bending, lifting or twisting.
>
> * * * * *
>
> We compared this information to the Essential Duties of Your Occupation as a Senior Principal System Architect. Your employer has confirmed that your occupation requires sitting 7 hours per day, with occasional standing and walking .5 hours per day each. Additionally, your employer confirmed that you are not required to do any lifting and you are not performing any twisting or bending activities. Based on this information, we have concluded that you are able to

15

perform these duties as of 10/19/2017.   We provided benefits through 10/18/2017, the date that we reviewed the medical information returned by Dr. Lemma.

We considered all of the evidence in your claim file in making our decision. The LTD policy states that benefits are payable if you are Disabled throughout and beyond the policy's Elimination Period.   The combined information in your file does not show that you are unable to perform the Essential Duties of Your Occupation on a full time basis as of 10/19/2017.   Because of this, we must terminate your claim for LTD benefits.

Alvarez also advised: "[ERISA] gives you the right to appeal our decision and receive a full and fair review. . . .  If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from the later of receipt of the letter or the end of benefits."  ECF 14-2 at 31.

In a telephone call on October 19, 2017, Alvarez explained to plaintiff the grounds for Hartford's decision.  *See id.* at 101 (Alvarez's notes of phone call).  Later that afternoon, Alvarez and Schkloven spoke again via telephone, and Schkloven indicated that Dr. Lemma had not released plaintiff to work and that Dr. Lemma misunderstood the Activity Report.  *Id.* at 100. In response, Alvarez explained to plaintiff that Hartford had provided benefits to plaintiff for the "standard recovery duration for someone with a sedentary job" and determined that the limitations indicated by Dr. Lemma did not "preclude [plaintiff] from performing his job," and thus "the decision still stands."  *Id.*  However, Alvarez advised Schkloven that he could appeal Hartford's decision and submit supplementary material from Dr. Lemma, indicating that Schkloven remained unable to perform a sedentary job.  *Id.*

Dr. Lemma's office faxed an amended Provider Activity Level Report to Hartford that day. *See* ECF 14-4 at 62 (the "Amended Activity Report"); *see id.* at 61 (reflecting date and time at which fax was submitted to Hartford).  Harris corrected the Report by crossing out the indication

16

that Schkloven had the capacity to engage in "Sedentary" activity and adding that plaintiff "has NOT been released to RTW yet[.]"  ECF 14-4 at 62.[20]

On October 25, 2017, Dr. Lemma's office sent another Activity Level Report to Hartford, which stated that Schkloven could not bend, lift, or twist.  *Id.* at 59.  Notably, it also provided that plaintiff was "unable to sit for any extend [sic] period" and was "requiring narcotic pain medications for pain."  *Id.*  Dr. Lemma added that plaintiff was "not cleared to return to work at this time" and that he would "re eval [*i.e.*, reevaluate] at next visit 1/10/18."  *Id.*

Thereafter, on November 2, 2017, plaintiff appealed Hartford's termination of his LTD benefits.  *Id.* at 58.  Schkloven wrote, *id.*:

> I am requesting that my termination from disability be appealed and reversed.  I am basing this on the following:
>
> My doctor's advice to me was that at this point, it was important to my recovery that I use as much pain medicine as necessary so that I can do the walking and exercise as I can.  It should be noted, that before I can get out of bed, I must take several different forms of pain medicine.  Without this medicine, I cannot sit, stand, or walk for more than a moment.  I cannot perform even the basic necessities— washing, bathing, going to the bathroom, getting dressed.  Even with the pain medicine, I cannot walk for more than 30 or 40 yards and I can only sit in a chair for a half hour at a time.  Most of he [sic] time, I must be in a reclining position using ice or heat.
>
> When I spoke to the surgeon's office, they were surprised that you made this decision, as they have not released me to return to work in any capacity.  Because of the nature of the pain medicine which is prescribed, I have been referred back to the pain management practice for my medicine.

Erik Solem, an "Appeal Specialist" employed by Hartford, confirmed Hartford's receipt of plaintiff's appeal by letter dated November 20, 2017, and indicated Hartford's intention to "make an appeal decision as soon as possible," likely "within 45 days of the receipt of the request."  ECF

---

[20] Defendant indicates that "'RTW'" is an abbreviation for "return to work."  ECF 22-1 at 6 (quoting ECF 14-4 at 62).

14-2 at 26.  And, the following day, November 21, 2017, Hartford sent a letter to Dr. Coleman seeking additional records regarding plaintiff's medical condition.  *Id.* at 24.  On the same date, Solem also sent a letter to both Dr. Coleman and Dr. Lemma (*id.* at 22), advising them that "an independent physician" would be contacting them to "for clarification of Mr. Schkloven's medical condition and functional status."  The parties do not indicate whether Dr. Coleman's office transmitted the requested records to Hartford.

On November 29, 2017, about four weeks after plaintiff submitted his appeal, Schkloven had a follow-up appointment with Dr. Lemma.  *See* ECF 14-4 at 46 (the "November 2017 Note"). Dr. Lemma indicated in his medical notes that Schkloven was "doing poorly" and that plaintiff's "symptoms have worsened."  *Id.*  Further, Dr. Lemma observed that plaintiff's "Ambulation is limited to less than 1 block," and that Schkloven was "not able to sit for longer than 15 or 20 minutes before having to reposition himself."  *Id.*  Dr. Lemma also stated that Schkloven's back pain required "around-the-clock pain medication," including oxycodone.  *Id.*  In his view, plaintiff's pain "appears myofascial in nature."  *Id.*[21]

Dr. Lemma opined that Schkloven's "neurological evaluation is improved"; "His preoperative complete right foot drop is a 4 out of 5" and "[t]he remainder of his examination is stable."  *Id.*[22]  Further, he observed that plaintiff could "stand upright with good posture," although "as the day progresses he finds himself hunching forward."  *Id.*  Accordingly, Dr. Lemma referred Schkloven for "trial of trigger point injections and possible Botox injections"; "therapy for spine

---

[21] The parties do not clarify the term "myofascial" pain.  Generally speaking,  it refers to "pain of, or relating to, the fascia surrounding and separating muscle tissue."  *Brenner v. Hartford Life and Acc. Ins. Co.*, WMN-00-608, 2001 WL 224826, at *1 n.2 (D. Md. Feb. 23, 2001) (citing *Stedman's Medical Dictionary* 1173 (27th ed. 2000)).

[22] Plaintiff advises that the term "foot drop" refers to "foot weakness."  ECF 21-1 at 3 (internal quotation marks omitted).  Defendant does not contest the characterization.

extension training and strengthening"; as well as "core strengthening." ECF 14-4 at 46. And, Dr. Lemma noted that he would see plaintiff "back in the spring for reevaluation.'" *Id.*

Hartford retained Jamie Lewis, M.D., a Board-certified physician in "Pain Medicine" and "Physical Medicine & Rehabilitation," to conduct an independent medical review ("IMR") of plaintiff's medical condition. ECF 14-4 at 13-21 (the "Lewis Report"). In the course of conducting the IMR, Dr. Lewis attempted to contact Dr. Lemma and Dr. Coleman, and left messages with office staff, seeking to discuss plaintiff's condition with them. *See id.* at 17-18 (listing attempts to contact Dr. Lemma, Mr. Harris, and Dr. Coleman between November 22, 2017 and November 28, 2017). But, "[c]ontact was unsuccessful." *Id.* at 19.

Accordingly, on November 29, 2017, Dr. Lewis faxed questions regarding his review to plaintiff's treating physicians. *Id.* at 21; *see id.* at 22-23 (faxed questions). But, Dr. Coleman, Dr. Lemma, and Mr. Harris did not respond to Dr. Lewis's questions. *Id.* at 21. However, Dr. Lewis received a fax from the office of Dr. Lemma on November 30, 2017, with a "copy of [the] most recent 11/29/17 office note, which is included in [Dr. Lewis's] review . . . ." *Id.*

Dr. Lewis summarized the records provided to him and determined, *id.* at 18:

Based on the history of extensive lumbar surgery, evidence of difficulty ambulating with use of a cane and neurological findings including loss of strength status post lumbar fusion and revision surgeries, it would be medically appropriate that this would affect [Schkloven's] ability to function for the period of Feb 2017 through present. The claimant would not have the capacity to return to work until 11/29/17, based on the most recent note. At this time he should have had the ability to return to work with restrictions as his neurological status was improved and his pain was noted to be mostly myofascial in nature.

Further, Dr. Lewis found, *id.* at 19: "Based on the provided documentation, there are no physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impacted by adverse medication side effects."

19

Dr. Lewis concluded, ECF 14-4 at 20: "On 11/29/17 it was noted that [plaintiff's] neurological status had improved and his pain appeared to be myofascial in nature. There was no evidence of any functional limitations that would prevent his ability to function with restrictions and limitations as outlined below." Specifically, Dr. Lewis indicated, among other things, that Schkloven should be able to sit for "60 minutes continually up to 6 hours per day with the ability to alter standing and walking as needed" as well as to stand and walk, each for "30 minutes at a time up to 5 hours per day." *Id.* Dr. Lewis also provided that plaintiff's "[p]rognosis for returning to work without restrictions is poor." *Id.* And, he advised, *id.*: "Re-evaluation of the claimant's function should be assessed three months from the date of this review as he continues to be treated with injections."

Based on Dr. Lewis's determinations, Hartford reversed its termination decision, which Solem communicated to plaintiff in a letter dated December 13, 2017. *See* ECF 14-2 at 19. Solem wrote, in part, *id.*:

> Based on our review that included additional information received and generated on appeal it was determined that the information in your file supports your claim of Disability under the Policy. As such, your claim for LTD benefits has been referred to the Ability Analyst for further handling. . . . .
>
> Please be advised that the decision to reverse the prior determination does not guarantee payment of benefits indefinitely; you must continue to satisfy all provisions of the Policy to remain eligible.

Thereafter, on December 14, 2017, Franklin Coulter completed an occupational analysis and determined that, as of November 29, 2017, Schkloven could "perform his own occupation in the general economy." *Id.* at 82; *see id.* at 82-84 (OA Report).[23] Accordingly, Coulter

---

[23] Defendant indicates that Coulter is a "Vocational Specialist." ECF 22-1 at 9. But, the parties do not specify Mr. Coulter's relationship with Hartford. Nor does the Record shed light on the issue.

recommended that Hartford find that, as of November 29, 2017, plaintiff was not disabled within the meaning of the Policy.  ECF 14-2 at 82.

Consistent with Coulter's recommendation, Hartford determined that, as of November 29, 2017, Schkloven no longer qualified as disabled.  *Id.* at 81. Alvarez communicated this determination to plaintiff via letter dated December 18, 2017.  *See id.* at 12-18.  Alvarez wrote, *id.* at 12, 17:

> We have completed our review of your claim for benefits and have determined that you do not meet the policy definition of Disability beyond 11/28/2017.  Because of this, Long Term Disability (LTD) benefits are not payable to you as of 11/29/2017.
>
> * * * * *
>
> We have concluded from the combination of all the medical information in your file that you are able to perform full time work within the restrictions and limitations outlined by the independent medical record reviewer as documented above.
>
> We compared this information to the Essential Duties of Your Occupation as a Senior Principal System Architect.  Based on this information, we have concluded that you are able to perform these duties as of 11/29/2017.  While you have reported continued pain and that your employer would not allow you to return to work while taking narcotic medications, this in an [sic] of itself does not constitute a Disability that would preclude you from performing the Essential Duties of Your Occupation in the general economy.
>
> Based on the outcome of the appeal review completed on 12/14/2017, we re-instated your claim for benefits effective 10/19/2017 through 11/28/2017. We considered all of the evidence in your claim file in making our decision. The LTD policy states that benefits are payable if you are Disabled throughout and beyond the policy's Elimination Period.

And, Alvarez again advised plaintiff of his right to appeal.  *Id.* at 17.  He also discussed the decision with Schkloven in a telephone call on December 18, 2017.  *Id.* at 81.

On January 12, 2018, Schkloven appealed Hartford's decision.  ECF 14-4 at 9.  He wrote, *id.*: "At my surgeon's examination on my back it was determined that at this point, that I was having nerve issues which were impeding my recovery and that I was referred to a specialist for

an FCE."  Plaintiff added, ECF 14-4 at 9: "I still am in moderately severe pain as I sit up and get out of bed, that I still cannot sit up straight for more than 10 or 15 minutes at a time that I cannot stand for more than 5 or10 minutes and that I cannot walk for more than a moment or two without stopping to brace myself from sciatica pain and weakness."  In addition, Schkloven said, *id.*: "I had to discontinue the narcotic pain medicine, because of the length of time that I have used it and because of the side effects and dependence that can result in extended use."

Further, plaintiff indicated that he "went for [his] scheduled follow-up appointment" with Dr. Lemma on January 10, 2018, and Dr. Lemma "was surprised and frustrated that [Hartford] made the decision to discontinue the disability . . . since he had stated that [plaintiff] could not perform the basic duties as [Hartford] had defined them and that he had not released [plaintiff] to work in any capacity."  *Id.*  But, plaintiff did not provide Hartford with any treatment notes concerning his medical appointment.

Yet, plaintiff supplemented his appeal on March 7, 2018, with a copy of a functional capacity evaluation ("FCE") that was completed by two officials associated with REHAB AT WORK—Pikesville (the "Clinic").  *See id.* at 5-8 (the FCE); *id.* at 4 (indicating date on which plaintiff supplemented his appeal).  The FCE reflects that Guy Seeley, a physical therapist associated with the Clinic, performed a "Musculoskeletal Evaluation" on plaintiff, and Matthew Drzik, the "Clinic Manager," completed and signed the FCE.  *See id.* at 5, 8.  The FCE indicated that Schkloven's "performance during testing was grossly consistent with the SEDENTARY Physical Demand Level on a part-time basis, at best . . . ."  *Id.* at 8.  The FCE also highlighted that plaintiff's functionality was subject to several notable limitations, including that he could sit for only five-minute periods, "with frequent change of position and posture"; stand with the assistance

of "a cane and/or leaning, up to 15 minute periods"; and walk up to 200 feet with the use of a cane. ECF 14-4 at 5.

The FCE concluded that plaintiff did not "currently demonstrate the ability to tolerate work within a full-time basis." *Id.* at 8. It continued: "At best, he would be appropriate for SEDENTARY work within a part-time basis due to his frequent need for breaks and slow productivity," as "[e]ven in sitting and standing, Mr. Schloven [sic] requires frequent shifting and maintains a posture that is not considered appropriate for workplace productivity." *Id.* Thus, according to the FCE, plaintiff, "might be better suited for an at home based job opportunity, but still would require frequent breaks and may have limited dependability in the amount he is able to maintain work both on a daily basis and on a day to day basis." *Id.*

Upon Hartford's receipt of the FCE, Juan Mendez, an Appeal Specialist for Hartford, sent a letter to plaintiff, dated March 8, 2017. *See* ECF 14-2 at 7-8. He stated, *id.* at 7: "With the receipt of this additional information we now have the complete appeal in our possession." He added that Hartford intended to make a decision within forty-five days. *Id.*

Hartford retained William Abraham, M.D. to conduct an IMR regarding plaintiff's condition. *See* ECF 14-3 at 73-78 (the "Abraham Report"). By letter dated March 12, 2018, Mendez contacted Dr. Lemma to advise him that Hartford had "asked a medical consultant" to review Schkloven's records and "speak with you directly in order to fully understand" plaintiff's functionality. ECF 14-2 at 9.

"A call was placed to Dr. Lemma on 03/13/18," but Dr. Abraham was advised that "Dr. Lemma does not do peer reviews for Disability." ECF 14-3 at 74. The Abraham Report indicates: "Discussion with the physician did not occur for this review." *Id*.

The Abraham Report, dated March 26, 2018, indicates that Dr. Abraham reviewed the FCE

as well as records from Dr. Coleman and Dr. Lemma.  *See* ECF 14-3 at 74 (listing records reviewed).[24]  Dr. Abraham provided an overview of plaintiff's medical history. *Id.* at 74-76.  He said, *id.* at 76:

> On 11/29/17 this gentleman was approximately three months postoperative from his revision lumbar fusion surgery.  He was reportedly doing poorly at that point in time.  While most individuals would typically have been capable of returning to work in some capacity within a three month period, I would submit that based on the extensive nature of this gentleman's revision surgery and the reports of him doing poorly at three months would suggest that his recovery was more protracted than one would have predicted.

But, Dr. Abraham also observed: "There is no information to have anticipated that within another month this gentleman wouldn't have seen improvement, particularly based on the fact that he was subsequently sent for an FCE in March demonstrating that he had functional capacities." *Id.* at 77.  And, he opined that, "as of 12/29/17, approximately four months postoperative, and moving forward this gentleman . . . would have been capable of functioning in a full time eight hours per day capacity at sedentary duty," with certain limitations.  *Id.*  These limitations included, among other things, "frequent (2.5 to 5.5 hours) sitting and occasional (less than 2.5 hours) standing, walking, bending, twisting, turning, stooping, and squatting."  *Id.*

In light of Dr. Abraham's opinion, Hartford extended plaintiff's LTD benefits for an additional month, through December 28, 2017. ECF 14-2 at 69.  And, Mendez communicated this decision to Schkloven by letter dated March 29, 2018.  *Id.* at 3-6.  Mendez wrote, *id.* at 4-5:

> Based on the evaluation of all the medical evidence currently available and the independent medical review performed by Dr. Abraham, we have determined that your disability was supported beyond 11/28/17 through 12/28/17; however, you would have been able to perform Your Occupation as a Systems Architect Principal as of 12/29/17 on a full time basis.

\* \* \* \* \*

---

[24] The Record does not reflect whether efforts were made to contact Dr. Coleman in regard to Dr. Abraham's review.

Therefore, you no longer meet the Policy definition of Disability for Your Occupation as of 12/29/17. The claim file has been referred back to the Maitland Disability Claim Office for payment of benefits from 11/29/17 through 12/28/17, and the claim file will remain closed.

Mendez also stated that Hartford's decision was final, "as administrative remedies available under the [Policy] have been exhausted." ECF 14-2 at 5. Further, Mendez advised plaintiff that he had "the right under Section 502(a) of ERISA to bring a civil action disputing this adverse benefit decision." *Id.* Although the Policy limited the time for plaintiff to bring such actions to "no more than 3 years after Proof of Loss is required," Hartford "extend[ed] the time for [plaintiff] to file a civil action . . . to no later than 3/29/2021," or "3 years from the date of this appeal decision." *Id.*; *see* ECF 14-1 at 22-23 (specifying time frame set forth in the Plan, in which plaintiff may initiate suit under ERISA).

By letter dated July 30, 2018, the SSA determined that Schkloven was entitled to SSD Benefits, effective as of January 2018. ECF 24-1 at 2 (the "SSA Determination"). However, "Social Security benefits for a given month are paid the following month." *Id.* Thus, by way of example, "Social Security benefits for March are paid in April." *Id.*

The SSA Determination specified, *id.*: "From January 2018 to May 2018, the full monthly Social Security benefit before any deductions was $2,519.50." ECF 24-1 at 2. However, in June 2018, the SSA began to deduct plaintiff's regular benefit in the amount of $134.00 to account for "medical insurance premiums." *Id.* Accordingly, in June 2018 the SSA reduced plaintiff's "regular monthly Social Security payment" to $2,385.00. *Id.*[25]

This litigation followed on March 9, 2021. ECF 1.

---

[25] The SSA Determination indicated that the "regular monthly payment" is "round[ed] down to the whole dollar." ECF 24-1 at 2.

## II.    Legal Principles

### A.  Standard of Review

The parties have filed cross motions for summary judgment with respect to plaintiff's ERISA claim.  Ordinarily, motions for summary judgment are governed exclusively by Fed. R. Civ. P. 56.  But, traditional summary judgment principles have limited application in ERISA cases such as this one, which are governed by the abuse of discretion standard, discussed *infra*. However, defendant has also moved for summary judgment with respect to the Counterclaim, asserting breach of contract, and relies on evidence that exists outside the Record.  *See* ECF 22-1 at 18-20; *see also* ECF 24-1 (SSA Determination).  The traditional standard of review associated with motions for summary judgment pertains to the Counterclaim.

When, as here, "'the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is,' in most respects, 'merely the conduit to bring the legal question before the district court, and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'"  *Stephan v. Unum*, 697 F.3d 917, 929-30 (9th Cir. 2012) (quoting *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009)); *see Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 320-323 (4th Cir. 2008) (discussing the abuse of discretion standard as the operative standard of review as to claims for denial of benefits brought under ERISA); *see also Garner v. Central States, S.E. and S.W. Areas Health and Welfare Fund*, 31 F.4th 854, 857 (4th Cir. 2022) (reviewing the abuse of discretion standard).  In contrast, Fed. R. Civ. P. 56(a) governs the Cross Motion with respect to the Counterclaim.

Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*,

954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc*., 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp*., 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc*., 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc*., 888 F.3d at 659; *Sharif v. United Airlines, Inc*., 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on an issue at trial, he must support the factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ."  But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; accord *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).  Rather, "there must be evidence on which the jury could

reasonably find for the nonmovant." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Kellen v. Lott*, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 Fed. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal*

*Co.*, 124 F.3d 639, 640 (4th Cir. 1997).  At the same time, if testimony from a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving.  *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F. App'x 209, 212 (4th Cir. 2017).

When, as here, the parties have filed cross motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'"  *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021).  Simply because opposing parties have moved for summary judgment does not mean that summary judgment to one side or the other is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2022) ("Wright & Miller").  And, as noted, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## B.  ERISA

ERISA was "enacted to protect the interests of participants in employee benefit plans and their beneficiaries . . . ."  *Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003); *see Bellon v. The PPG Employee Life and Other Benefits Plan*, ___F.4th__, 2022 WL 2760764, at *6 (4th Cir. July 15, 2022); *see also United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir. 1998) (stating that a primary purpose of ERISA is to "ensure the integrity of written, bargained-for benefit plans"); 29 U.S.C. § 1001(b).  It does so, *inter alia*, by setting "'various uniform standards [for employee

benefit plans], including rules concerning reporting, disclosure, and fiduciary responsibility.'" *Retail Industry Leaders Assoc. v. Fielder*, 475 F.3d 180, 190 (4th Cir. 2007) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983)).

Under ERISA, "[e]very employee benefit plan" must be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), "specify[ing] the basis on which payments are made to and from the plan." *Id.* § 1102(b)(4). The plan must be administered "in accordance with the documents and instruments governing the plan . . . ." *Id.* § 1104(a)(1)(D); *see Kennedy v. Plan Administrator For DuPont Savings and Investment Plan*, 555 U.S. 285, 300 (2009).

"ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law." *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996); *see Bellon*, 2022 WL 2760764, at *8. The Supreme Court underscored in *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013): "'The plan, in short, is at the center of ERISA' . . . [O]nce a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.' . . . This focus on the written terms of the plan is the linchpin of 'a system that is [not] so complex that administrative costs, or litigation expense, unduly discourage employers from offering [ERISA] plans in the first place.'" (Citations omitted; alterations in *Heimeshoff*); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (recognizing that ERISA's statutory scheme "is built around reliance on the face of written plan documents"); *Boyd v. Metro. Life Ins. Co.*, 636 F.3d 138, 140 (4th Cir. 2011) (recognizing that "plan administrators must act 'in accordance with the documents and instruments governing the plan . . . .'") (citation omitted).

In general, entitlement to benefits "turn[s] on the interpretation of the terms in the plan at issue." *Firestone Tire and Rubber Co. v. Burch*, 489 U.S. 101, 115 (1989); *see, e.g.*, *Johnson v. American United Life Ins. Co.*, 716 F.3d 813, 819–21 (4th Cir. 2013) (examining language of ERISA insurance policy provision to determine plan participant's eligibility).  Notably, "'[c]ourts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'"  *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013) (quoting *Firestone Tire*, 489 U.S. at 113).  Thus, "the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 220 (4th Cir. 2005) (internal quotation marks omitted), *aff'd*, 547 U.S. 356 (2006.  As the Supreme Court said in *McCutchen*, 569 U.S. at 100, ERISA's "statutory scheme . . . is built around reliance on the face of written plan documents." (Internal quotation marks omitted).

Principles of contract law require a federal court to enforce "the plan's plain language in its ordinary sense.  *Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir.1996) (internal quotation marks and citations omitted). Therefore, the court must determine the ordinary meaning of terms "as a reasonable person in the position of the plan participant would have understood the words."  *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 1995) (internal citations omitted).

Moreover, "ERISA plans, like contracts, are to be construed as a whole.  *Id.*  Thus, in interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir.1993).  And, "a court should be hesitant to depart from the written terms of a contract . . . in a case involving ERISA,

which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992), *cert. denied*, 506 U.S. 1081 (1993).

As to the statute, courts "'must enforce plain and unambiguous statutory language in ERISA,' as in any statute, 'according to its terms.'" *Intel Corp. Investment Policy Committee v. Sulyma*, ___U.S.___, 140 S. Ct. 768, 776 (2020) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)).  And, of import here, ERISA establishes a series of causes of action to enforce its provisions, the rights of plan beneficiaries, and for other purposes.  These are primarily laid out in ERISA § 502(a), codified at 29 U.S.C. § 1132(a).

Plaintiff asserts a claim for wrongful termination of disability benefits, which implicates ERISA § 502(a)(1)(B).  Under ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), "a plan participant may bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (quoting 29 U.S.C. § 1132(a)(1)(B)).  "[A]n ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits is controlling." *McWilliams v. Metropolitan Life Ins. Co.*, 172 F.3d 863, 1999 WL 64275, at *2 (4th Cir. Feb. 11, 1999) (unpublished) (citing *Bolton v. Construction Laborers Pension Trust*, 56 F.3d 1055, 1058 (9th Cir.1995)).

Ordinarily, "a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*, 489 U.S. at 115; *see Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111,

(2008); *Woods v. Prudential Ins. Co. of America*, 528 F.3d 320, 322 (4th Cir. 2008).  Therefore, as a threshold matter, the Court must determine, *de novo*, whether a plan's "provision for benefits is prescriptive or discretionary . . . ." *See Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000).

When the Plan vests the administrator with discretionary authority to determine eligibility, the administrator's decision is reviewed for abuse of discretion.  *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).  "'If the plan [does] not give the employer or administrator discretionary or final authority to construe uncertain terms,'" the court looks to "'the terms of the plan and other manifestations of the parties' intent.'"  *Booth*, 201 F.3d at 340-41 (alteration in *Booth*) (quoting *Firestone Tire*, 489 U.S. at 112-13).  But, "'[w]here discretion is conferred upon the trustee with respect to the exercise of a power,'" the court on review must determine whether there was "'an abuse by the trustee of his discretion.'"  *Booth*, 201 F.3d at 341 (quoting *Firestone Tire*, 489 U.S. at 111).

The Policy names Hartford "as the claims fiduciary for benefits provided under the Policy" and grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  ECF 14-1 at 38.  Accordingly, the parties agree, without discussion, that the abuse of discretion standard governs plaintiff's claim for LTD benefits.  ECF 21-1 at 9-10 (recognizing the abuse of discretion standard as the relevant standard of review); ECF 22-1 at 12 (same).  Thus, the Court may not disturb Hartford's decision if it is reasonable.  *See Williams*, 609 F.3d at 630.  And, a decision of the administrator is reasonable if it results from a "'deliberate, principled reasoning process' and [is] supported by substantial evidence."  *Id.* (citation omitted).

The standard "requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans*, 514 F.3d at 322; *accord Garner*, 31 F.4th at 857.  In other words, the court may not substitute its own judgment for that of the administrator. *Williams*, 609 F.3d at 630.

In *Booth*, 201 F.3d at 342-43, the Fourth Circuit outlined eight factors to consider in evaluating the reasonableness of a benefit decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Notably, the application of the abuse of discretion standard limits the evidence a court may consider in reviewing the plan administrator's decision. "Generally, consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion." *Helton v. AT&T, Inc.*, 709 F.3d 343, 353–54 (4th Cir. 2013) (citing *Sheppard & Enoch Pratt Hospital, Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994)).  But, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the [abuse of discretion] factors and the evidence was known to the plan administrator when it rendered its benefits determination." *Helton*, 709 F.3d at 356.  Otherwise, the federal courts "would have effectively surrendered [their] ability to review ERISA benefits determinations because plan administrators could simply omit any evidence from the administrative record that would suggest their decisions were unreasonable." *Id.* at 353.  And, under the principles of agency

law, "an ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records." *Id.* at 356.

## III.    Discussion

Both parties have moved for summary judgment as to plaintiff's ERISA claim for the wrongful termination of benefits.  Additionally, defendant has moved for summary judgment as to its Counterclaim, which is styled as a claim for breach of contract.  I address each issue, in turn.

### A.  ERISA Claim

Schkloven argues that he is entitled to summary judgment as to his ERISA claim, on the ground that Hartford's "adverse benefits decision was not based on substantial evidence," and thus it was unreasonable.  ECF 21-1 at 10 (underlining omitted).  In particular, plaintiff contends that he provided Hartford with "evidence that he developed potentially disabling spine conditions," from which he continued to suffer beyond December 29, 2017, the date on which his LTD benefits were terminated.  *Id.* at 11.

Further, Schkloven maintains: "Hartford operates under an inherent financial conflict of interest because adverse benefits decisions increase [its] earnings and profitability, while favorable benefits decisions have the opposite effect."  *Id.* at 10.  And, Schkloven criticizes Hartford's decision-making process because Hartford failed to "obtain an in person medical examination in connection with its review of [his] disability claim."  *Id.* at 15.  Additionally, plaintiff contends that Hartford failed to consider the most current medical information before resolving his last appeal.  ECF 23 at 5-6.

In the Cross Motion, Hartford argues that its decision to terminate plaintiff's disability benefits, effective December 29, 2017, was "supported by the substantial evidence in the record and is reasonable in light of all that evidence."  ECF 22-1 at 14.  In short, Hartford contends that

plaintiff "has not sustained his burden of showing" that Hartford abused its discretion in its determination that plaintiff "was no longer disabled" within the meaning of the LTD Policy as of December 29, 2017. ECF 22-1 at 14.[26] According to Hartford, it "engaged in a deliberate and principled review in which it  communicated with Plaintiff the reasons for its initial decision and the information it needed on appeal." *Id.* at 18.

### 1.  Decision-making Process

Hartford was tasked under the Plan with the obligation to review and assess plaintiff's medical condition for purposes of eligibility for LTD benefits.  Schkloven twice appealed Hartford's decision to terminate his LTD disability benefits. *See* ECF 14-4 at 9, 58.  And, he was twice successful.  ECF 14-2 at 3-6, 12-17.

Nevertheless, Schkloven claims that Hartford's review process was deficient on the ground that Hartford should have conducted an independent medical examination ("IME") of plaintiff. ECF 21-1 at 15-16.  Moreover, plaintiff asserts that, in resolving his second appeal, Hartford failed to consider evidence relating to what was then his most recent appointment with Dr. Lemma in January 2018.  ECF 23 at 5-6.  And, plaintiff contends that Hartford's decision making was tainted by a financial conflict of interest.  ECF 21-1 at 10.

---

[26] In the alternative, Hartford claims that if the Court "conclude[s] that Hartford abused its discretion in terminating Plaintiff's LTD benefits, the matter would need to be remanded for a determination as to Plaintiff's continuing eligibility for . . . benefits . . . ." ECF 22-1 at 18 n.8.  It argues that because plaintiff seeks damages equal to the amount of benefits he would have received for 36 months under the terms of the Policy (*see* ECF 21-1 at 16), it would be necessary for Hartford to determine whether plaintiff would have been eligible for disability benefits throughout this timeframe.  ECF 22-1 at 18 n.8.

Because I determine that Hartford is entitled to summary judgment with regard to plaintiff's ERISA claim, I need not consider the merits of this argument.

As noted, Hartford awarded LTD benefits to plaintiff, effective August 5, 2017.  ECF 14-2 at 42-46.  The Award advised plaintiff that Hartford would periodically require updated medical information from plaintiff to determine if he remained disabled within the meaning of the Policy and thus eligible for continued long term disability benefits.  *Id.* at 44.  On October 5, 2017, two months after the Award and about six weeks after plaintiff's revision surgery on August 22, 2017, Hartford requested updated medical records from Dr. Lemma.  *Id.* at 35.

Thereafter, Dr. Lemma provided information to Hartford indicating that, as of October 4, 2017, plaintiff's condition was improving.  ECF 14-5 at 6.  And, on October 11, 2017, Dr. Lemma advised Hartford that plaintiff could perform sedentary activities.  *Id.* at 2.  Based on this information, Hartford terminated plaintiff's disability benefits, effective October 19, 2017, and communicated the basis of its decision to plaintiff.  *See id.* at 28-32.

Schkloven appealed Hartford's decision, and submitted additional information from Dr. Lemma in an effort to show that he remained incapable of working.  *See* ECF  14-4 at 58; *id.* at 46.  At that juncture, Hartford retained Dr. Lewis to complete an IMR of plaintiff's condition.  Dr. Lewis reviewed all records made available to him, including the November 2017 Note, before ultimately concluding that plaintiff's condition had sufficiently improved so that, by November 29, 2017, Schkloven could perform sedentary work, subject to certain limitations.  *See id.* at 13-21.  Thereafter, Hartford obtained an "Occupational Analysis" which indicated that, in light of Dr. Lewis's findings, Schkloven was able to perform his job as of November 29, 2017.  ECF 14-2 at 82-84.  Consistent with these recommendations, Hartford awarded disability benefits to plaintiff for another month, effective through November 28, 2017.  *Id.* at 12-18.

Plaintiff again appealed Hartford's decision and subsequently submitted the FCE for Hartford's consideration.  ECF 14-4 at 9; *see id.* at 5-8.  In turn, Hartford retained a second

38

physician, Dr. Abraham, to conduct another IMR of plaintiff's condition.  ECF 14-3 at 73-78.

Notably, Dr. Abraham disagreed with Dr. Lewis as to the import of the November 2017 Note,

finding that it suggested plaintiff would have required another month of time to recover before he

would have been capable of returning to work.  *Id.* at 77.  But, given the totality of the evidence

presented to Dr. Abraham, including the FCE, he opined that Schkloven would sufficiently recover

by December 29, 2017, such that he would be able to perform the basic functions of his job as of

that date.  *Id.*  Accordingly, Hartford again extended plaintiff's LTD benefits for another one-

month period.  ECF 14-2 at 5.

Plaintiff argues that the IMR was not adequate.  He claims that Hartford should have

obtained an IME.  But, Hartford was not required under the terms of the Policy to retain a physician

to examine the claimant before reaching a decision as to his eligibility for LTD benefits.  *See Laser*

*v. Provident Life & Acc. Ins. Co.*, 211 F. Supp. 2d 645, 650 (D. Md. 2002) (explaining that

"independent examinations of claimants are not required," although they are "common in ERISA

cases").  Indeed, the Plan empowered Hartford to require a claimant to "be examined by a

Physician, vocational expert, functional expert, or other medical or vocational professional of

[Hartford's] choice,"  ECF 14-1 at 20, but it did not require Hartford to complete such an

examination prior to rendering a decision to terminate LTD benefits.  *See Dean v. Daimlerchrysler*

*Life, Disability and Health Care Benefits Program*, RDB-09-2992, 2010 WL 3895363, at *4 (D.

Md. Sept. 29, 2010) (finding that where an ERISA plan enables, but does not mandate, a plan

administrator to complete IMEs of claimants before terminating disability benefits, "a plan

administrator's choice not to order an independent medical examination . . . does not constitute an

abuse of discretion"), *aff'd*, 439 F. App'x 265 (4th Cir. 2011) (per curiam).

To be sure, the fact that the Policy did not mandate an IME is not dispositive. The failure of a fiduciary to retain a physician to conduct an IME of the claimant is a consideration in deciding whether the fiduciary conducted a reasonable review. *See Reidy v. Unum Life Ins. Co. of Amer.*, PX-16-2926, 2018 WL 3756740, at *6 (D. Md. Aug. 7, 2018) (collecting cases). This is particularly so when there is a "lack of objective evidence" in the record and "the claimant suffers from a disability condition encompassing subjective complaints," such as depression. *Zhou v. Metro. Life Ins. Co.*, 807 F. Supp. 2d 458, 474 (D. Md. 2011); *see Ramirez v. Liberty Life Assur. Co. of Boston*, 3:18-cv-00012-RJC, 2019 WL 469930, at *8 (W.D.N.C. Feb. 6, 2019) ("[C]ourts have reprimanded claims administrators for relying primarily on record-reviewing doctors without giving equal credence to treating physician's opinions or claimants' subjective complaints, especially in instances where the claimant suffers from a mental illness.[ ]"); *Smith v. PNC Financial Servs. Grp.*, MJG-15-2232, 2017 WL 3116689, at *13-14 (D. Md. July 21, 2017) (observing the same where claimant's disability stemmed from "stress and anxiety caused by work").

In this case, however, plaintiff's disability was not related to a mental health condition; it stemmed from his physical condition. *See* ECF 14-6 at 23-24 (treatment notes dated February 8, 2017); *id.* at 10-11 (treatment notes dated June 21, 2017). Plaintiff's complaints as to his pain could be deemed subjective. But, there is considerable objective evidence regarding plaintiff's physical and functional condition, which I recounted earlier. *See*, *e.g.*, *id.* at 8-9 (MRI results of exam on June 22, 2017). Hartford had ample evidence on which to base a sound decision. Defendant's failure to obtain an IME of plaintiff does not render its review process procedurally deficient or unreasonable.

Schkloven also asserts that Hartford's review of his second appeal was insufficient because Hartford failed to obtain evidence concerning an appointment plaintiff had with Dr. Lemma in January 2018.  ECF 23 at 5-6.  This claim lacks merit.

As plaintiff advises, the appeal references that plaintiff had a recent appointment with Dr. Lemma, thereby providing Hartford with at least constructive knowledge of additional information relevant to plaintiff's condition.  *See* ECF 14-4 at 9.  Moreover, plaintiff is correct that the Fourth Circuit has previously indicated that a plan fiduciary may not ignore evidence that it knows it does not have within its possession.  *See Harrison v. Wells Fargo Bank N.A.*, 773 F.3d 15, 21 (4th Cir. 2014).  But, "a plan administrator has no duty to develop evidence that a claimant is not disabled prior to denying benefits."  *Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F. App'x 950, 957 (4th Cir. 2010) (per curiam) (citation omitted).

The Record makes plain that Hartford's failure to consider evidence regarding plaintiff's condition in January 2018 was, if anything, the fault of Dr. Lemma and plaintiff.  Upon initiating its review of Schkloven's last appeal, Hartford wrote to Dr. Lemma, informing him that it had retained an independent physician to review plaintiff's case, and the physician would soon seek updated information regarding plaintiff's condition with Dr. Lemma.  ECF 14-2 at 9.  Consistent with Hartford's assertion, Dr. Abraham attempted to reach out to Dr. Lemma to discuss the state of plaintiff's disability, but he was advised that Dr. Lemma did "not do peer reviews for Disability."  ECF 14-3 at 74.  As defendant states: "It is not clear how Hartford could be willfully blind to the opinion of a physician it repeatedly sought."   ECF 25 at 6; *see Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608 (4th Cir. 1999) ("Having failed to submit supplemental vocational information, Elliott cannot now prevail on an argument that Sara Lee had insufficient evidence to make a reasoned decision.").

41

In any event, although Hartford was unable to obtain the report from Dr. Lemma concerning the appointment of January 10, 2018, plaintiff could have provided it. Plaintiff certainly advised Hartford of the exam, and related Dr. Lemma's frustration that Hartford had discontinued benefits. ECF 14-4 at 9. But, he provided no information as to what the exam of January 10, 2018, actually showed as to his condition. Nor did plaintiff seek to amplify the record to include the medical report of January 10, 2018, even though he had chosen to supplement his appeal in March 2018 by submitting the FCE. *Id.* at 5-8. Moreover, there is no basis to conclude that the content of the doctor's report from January 10, 2018, would have supported a different outcome by Hartford.

Plaintiff also complains that Hartford had a financial conflict of interest, because it is both the insurer and the decisionmaker with respect to any claims for benefits under the Plan; benefits decisions affect its earnings. ECF 21-1 at 10; *see* ECF 14-1 at 37; *accord* RESTATEMENT (SECOND) OF TRUSTS § 187 cmt. d. Thus, he asks the Court to reject Hartford's determination. But, there is no basis to conclude that any conflict of interest played a role in Hartford's decision-making process.

"A conflict of interest is readily determinable by the dual role of an administrator or other fiduciary . . . ." *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). In other words, where a fiduciary "'both evaluates and pays claims for benefits' there is a structural conflict of interest which entitles courts to 'determine the likelihood that a [fiduciary's] conflict of interest influenced its decision.'" *Kane v. UPS Pension Bd. of Trustees*, RDB-11-3719, 2012 WL 5869307, at *4 (D. Md. Nov. 19. 2012) (quoting *Clark v. Unum Life Ins. Co. of America,* 799 F. Supp. 2d 527, 531, 33 (D. Md. 2011) (alteration added)); *see also Glenn*, 554 U.S. at 112.

Yet, Hartford twice extended plaintiff's LTD benefits, in reliance on the recommendations of two physicians it had retained, each of whom completed an independent review of plaintiff's medical records. *See* ECF 14-2 at 3-6, 12-18. As Judge Chuang of this Court explained, the "retention of independent physicians to review the medical records and assess [the claimant's] ability to work helps to mitigate [the fiduciary's] 'potential conflict of interest as [fiduciary] and insurer,' because the independent physician is 'presumably free of defendant's conflict of interest.'" *Everette v. Liberty Life Assur. Co. of Boston*, TDC-16-1248, 2017 WL 2829673, at *11 (D. Md. June 29, 2017) (quoting *DiCamillo v. Liberty Life Assur. Co. of Boston*, 287 F. Supp. 2d 616, 624 (D. Md. 2003) (alterations added)).

In the absence of any evidence to the contrary, I am satisfied that Hartford's conflict of interest did not bias its decision-making process. *Accord Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 295 n.7 (4th Cir. 2006) (rejecting view that an IMR was biased in light of the two reviewing physicians' "affiliation with a firm that markets its medical review services to disability insurers" because there was no "evidence suggesting that this affiliation unduly influenced either [physicians'] review of the medical evidence").

I conclude that Hartford engaged in a "fair and searching process" with respect to plaintiff's effort to obtain LTD benefits. *See Evans*, 514 F.3d at 323. I am also persuaded that defendant's review process qualified as "deliberate and principled." *Donnell*, 165 F. App'x at 295. Therefore, Hartford did not abuse its discretion with respect to its decision-making process.

Accordingly, I turn to the substance of Hartford's decision.

### 2.  Proof of Continuing Disability

To determine whether Hartford abused its discretion in terminating Schkloven's long term benefits, the Court must determine whether Schkloven discharged his "initial burden of submitting

proof that [he] could not perform even sedentary work." *Stup v. Unum Life Ins. Co.*, 390 F.3d 301, 308 (4th Cir. 2004). In the event plaintiff satisfies this threshold issue, the Court must then determine whether there was "substantial evidence" that he could perform such work. "Substantial evidence" is defined as "the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that 'a reasoning mind would accept as sufficient to support a particular conclusion.'" *Donnell*, 165 F. App'x at 295 (citation omitted).

The Policy provides that in order to qualify as "Disabled," a claimant must show that he is "prevented from performing one or more of the Essential Duties" of his occupation, as a result of an "accidental bodily injury, sickness, Mental Illness, Substance Abuse, or pregnancy." ECF 14-1 at 24. The OA Report highlighted that the Essential Duties of Schkloven's position with CSRA included "Sitting for 7 hours at one time up to 7 total hours during a typical workday"; standing and walking, each "up to half-hour at one time, up to a half-hour total during a typical workday"; "Occasional below waist level reaching and bilateral handling"; "Frequent reaching at waist/desk level"; and "Constant bilateral fingering". ECF 14-2 at 83.

Schkloven furnished evidence showing that he had "developed potentially disabling spine conditions," including spinal stenosis and intervertebral disc degeneration. ECF 21-1 at 11; *see*, *e.g.*, ECF 14-6 at 23-24 (treatment notes dated February 8, 2017); *see also* ECF 14-6 at 25-26 (MRI results). He suffered "stabbing pain in the low back that radiate[d] down the posterior lateral aspect of the legs to his knees." ECF 14-6 at 23. Accordingly, on March 21, 2017, plaintiff underwent lumbar spine surgery to treat those conditions. *See id.* at 20-21 (notes from surgery).

At a follow-up appointment on June 21, 2017, Dr. Lemma observed, among other things, that Schkloven was not able to sit for more than one hour at a time. *Id.* at 57. Dr. Lemma anticipated that plaintiff's limitations would persist for another six months, through December

2017, a period of nine months after the initial surgery, and about three months after the revision surgery. *Id.* Further, according to Dr. Lemma's observations, plaintiff's functionality remained impaired in July 2017. *See* ECF 14-6 at 3-4  Upon receipt of this evidence, Hartford awarded long term disability benefits, effective August 5, 2017. *See* ECF 14-2 at 42-46; *see also id.* at 41 (indicating that plaintiff's disability benefits were effective as of August 5, 2017).

Based on the evidence, plaintiff satisfied his initial burden to establish that he was disabled within the meaning of the LTD Policy. Accordingly, the question becomes whether substantial evidence supported Hartford's determination that, as of December 29, 2017, plaintiff no longer remained disabled within the meaning of the Policy.

Plaintiff acknowledges that evidence in the Record supports that at least some aspects of his condition had improved by the fall of 2017. *See* ECF 21-1 at 12. But, he argues: "Improvement in a disabling medical condition is by itself [an] inadequate reason to cut off benefits because a claimant may improve considerably and still remain disabled." *Id.*; *see Evans*, 514 F.3d at 324. Further, in his view, the Record contains no evidence that suggests that, as of December 29, 2017, he no longer qualified as "Disabled" within the meaning of the LTD Policy. ECF 21-1 at 13-14.

Defendant rejects this position, asserting that "[s]ubstantial evidence supports [its] decision that Plaintiff was not disabled from his own sedentary occupation" as of December 29, 2017. ECF 22-1 at 14. Hartford posits that although Schkloven "continued to have some pain after his August revision surgery," this "does not render one disabled under the Policy." *Id.*

Deference is afforded to an ERISA fiduciary, such as Hartford. In *Evans*, 514 F.3d at 326, the Fourth Circuit explained that "deference has a particular significance in the context of ERISA," and a "cavalier approach to the deference owed ERISA fiduciaries who contract for it would likely disserve [ERISA's] purpose, whatever the call on [the Court's] compassion in a particular case."

The Record reveals from plaintiff's own treatment providers that in the months following plaintiff's revision surgery on August 22, 2017, his condition steadily improved.  On September 5, 2017, Mr. Harris remarked that the pain in plaintiff's right leg had abated and that the strength of plaintiff's right ankle had improved.  ECF 14-5 at 20-21.  By October 4, 2017, Dr. Lemma observed that although plaintiff was still in pain, he was improving functionally.  *Id.* at 6.  In particular, Dr. Lemma indicated that Schkloven was "able to walk around his neighborhood"; "feels his strength has improved"; and was "able to sit upright," which, before surgery, he had not been able to do.  *Id.*  And, on October 11, 2017, Dr. Lemma advised Hartford that Schkloven could perform sedentary functions, although he later revised this assessment and stated that he did not believe plaintiff was yet fit to return to work.  *See id.* at 2 (Activity Report); ECF 14-4 at 62 (Amended Report).  In sum, the Record lays bare that plaintiff's condition steadily improved in the fall of 2017.

Certainly, plaintiff's progress was not without setbacks.  The second surgery occurred in August 2017.  ECF 14-5 at 22-23.  And, Schkloven's medical records reflect that by November 29, 2017, plaintiff's symptoms had worsened.  ECF 14-4 at 46.  Dr. Lemma observed that plaintiff's "Ambulation is limited to less than 1 block," and that Schkloven was "not able to sit for longer than 15 or 20 minutes before having to reposition himself."  *Id.*  Consequently, Schkloven required "around-the-clock pain medication."  *Id.*

But, even in the November 2017 Note, Dr. Lemma observed that Schkloven's neurological condition had improved, his foot weakness was continuing to improve, and plaintiff's condition was otherwise stable.  *Id.*  Further, Dr. Lemma observed that plaintiff could "stand upright with good posture," although over time, he "finds himself hunching forward."  *Id.*

As discussed, Hartford retained Dr. Lewis to review plaintiff's medical records. *Id.* at 13-21. He found that the records did not support a finding that plaintiff was unable to work in a sedentary capacity as of November 29, 2017. *Id.* at 20. In this regard, Dr. Lewis considered Dr. Lemma's observations, set forth in the November 2017 Note, and determined that the information supported a finding that by November 29, 2017, plaintiff "should have had the ability to return to work with restrictions as his neurological status was improved and his pain was noted to be mostly myofascial in nature." ECF 14-4 at 20.

Dr. Abraham, the second physician retained by Hartford to review plaintiff's medical records, disagreed with Dr. Lewis with respect to the import of the November 2017 Note. He observed that "most individuals" similarly situated to plaintiff "would typically have been capable of returning to work in some capacity within a three month period[.]" ECF 14-3 at 76. But, as noted, plaintiff underwent revision surgery on August 22, 2017. ECF 14-5 at 22-23. Dr. Abraham was of the view that most individuals with such surgery would have recovered by late November 2017. ECF 14-3 at 76. Nevertheless, given that Dr. Lemma observed that as of November 29, 2017, plaintiff continued to do poorly, Dr. Abraham found that Schkloven's "recovery was more protracted than one would have predicted." *Id.*

Even so, it was Dr. Abraham's position that "there is no information to have anticipated that within another month this gentleman wouldn't have seen improvement . . . ." *Id.* at 77. Bolstering this view, Dr. Abraham explained that the FCE indicated that as of March 7, 2018, plaintiff had "functional capacities." *Id.*; *see* ECF 14-4 at 7 (finding that "Mr. Schkloven's performance during the functional testing was grossly consistent with the SEDENTARY Physical Demand Level Category"). And, in light of the continued improvement in plaintiff's condition, as exhibited in the FCE, Dr. Abraham reasoned that, as of December 28, 2017, plaintiff would have

been capable of "functioning in a full time eight hours per day capacity at sedentary duty," subject to a number of limitations.  ECF 14-3 at 77.

Based on the evidence, including Dr. Abraham's opinion, Hartford determined that as of December 29, 2017, plaintiff no longer qualified as disabled with respect to his sedentary job. ECF 14-2 at 3-6.  Hartford wrote, *id.* at 4: "The evidence indicates that based on the extensive nature of the revision surgery you underwent in August 2017, you would have required additional recovery time [beyond] the customary 3 months recovery period.  According to Dr. Abraham, such additional time would have been extended from 11/29/17 through 12/28/17, and that you would have been able to perform at the full time sedentary level of function as of 12/29/17."  Hartford acknowledged that although plaintiff may still "experience symptoms related to [his] lumbar spine condition," which may "interfere with [his] ability to perform certain tasks, . . . the evidence indicates that [his] residual level of function is consistent with the ability to perform at least at full time sedentary level."  *Id.* at 5.

Plaintiff contends that Hartford's decision was not reasonable because it irrationally disregarded the evidence contained in the Record that established plaintiff's continued disability. ECF 21-1 at 12-14. For instance, Schkloven points out that "Dr. Lemma's multiple Provider Activity Level Reports  . . . state that [he] was unable to sit for any extended period of time and was not released to return to work."  *Id.* at 11-12.  Schkloven also points out (*id.* at 13-14) that the FCE provided that as of March 7, 2018, he remained unable to work in a full time capacity.  *See* ECF 14-4 at 8.  Accordingly, plaintiff maintains that Dr. Abraham, and thus Hartford, erred because it did not credit the information contained in the FCE regarding the limitations on his functional capacity.  ECF 21-1 at 14.

But, Hartford's decision was supported by substantial evidence.  It was not compelled from the evidence to conclude that plaintiff was disabled after December 28, 2017.

Plaintiff did not present evidence from his treating physicians that he remained unable to work at his sedentary job as of December 28, 2017.  Dr. Abraham did not offer any explanation as to why he disagreed with the FCE's conclusion that plaintiff could not work on a full time basis. But, Dr. Abraham's failure to articulate the basis for his disagreement with the FCE regarding plaintiff's ability to return to work in a full time capacity does not require the Court to reject his conclusion.  The results of the FCE could be construed as "equivocal with respect to Schkloven's ability to return to work."  ECF 21-1 at 13-14.  Indeed, the FCE provided: "At best, [plaintiff] would be suited for part-time work within the levels and limitations documented with the ability to take breaks, change position and work at a self-directed pace."  ECF 14-4 at 7.

Moreover, Dr. Abraham considered the results of the FCE in light of his experience, *i.e.*, most individuals recover from revision surgery within three months.  He also considered the FCE against the backdrop that plaintiff's functional capacity generally reflected signs of continued improvement during the fall of 2017, although the extent of his reported pain fluctuated.  *See* ECF 14-3 at 75-76.[27]  And, plaintiff's treating physicians did not corroborate the FCE.  *See Everette*, 2017 WL 2829673, at *12 (explaining that the result of a FCE is less persuasive if it is not reviewed by the claimant's treating physician).

In sum, Hartford was presented with evidence that, as of December 29, 2017, plaintiff could perform his sedentary job.  Given the deferential standard of review, Hartford's decision was not an unreasonable one.

---

[27] Of course, people tolerate pain differently.  That said, many people go to work with their aches and pains, particularly when the job is a sedentary one.

Therefore, I shall deny the Motion.  Moreover, I shall grant the Cross Motion with respect to plaintiff's claim for the wrongful termination of benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B).

### B.  Counterclaim

### 1.

Defendant has moved for summary judgment with respect to its Counterclaim.  Hartford asserts a claim for breach of contract, *i.e.*, the Policy, and seeks recovery of alleged overpayments to Schkloven.  *See* ECF 22-1 at 18-20.  Hartford also maintains that it "should . . . be awarded the fees and costs incurred with the filing of this motion."  *Id.* at 20.  Schkloven does not substantively respond to the Cross Motion on this point, contending only that there is insufficient evidence to warrant awarding summary judgment to Hartford as to the Counterclaim.  ECF 23 at 7.

The Counterclaim indicates that the Court has supplemental jurisdiction under 28 U.S.C. § 1367.  *See* ECF 7 at 5, ⁋ 2.  Hartford asserts that plaintiff's failure to reimburse Hartford in the amount of the SSD Benefits awarded to plaintiff contravenes the Policy's terms and thus constitutes a breach of contract.  *Id.* at 5-6, ⁋⁋ 1-19; *see also* ECF 22-1 at 18-20.  The Counterclaim does not cite any ERISA provision.

In its memorandum, Hartford does not discuss subject matter jurisdiction.  Notwithstanding Hartford's reliance on supplemental jurisdiction, which would apply for a claim under State law, the Policy is governed by ERISA.  ECF 14-1 at 36.  Defendant's claim plainly implicates ERISA's complex remedial scheme.  *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355, 356 (2002) (acknowledging that ERISA enumerates certain "civil actions for . . . specific types of relief") (footnote omitted).

To be sure, the Fourth Circuit has instructed that a district court must "'interpret an ERISA [employee benefit] plan under ordinary principles of contract law, enforcing the plan's plain

language in its ordinary sense.'" *Bellon*, 2022 WL 2760764, at *8 (quoting *Wheeler v. Dynamic Eng'g, Inc.,* 62 F.3d 634, 638 (4th Cir. 1995)) (alteration in *Bellon*). But, it does not follow that a claim seeking to enforce the terms of an ERISA plan is cognizable as a State law claim. Indeed, ERISA has broad preemptive effect with respect to State law claims. *See* 29 U.S.C. § 1144 ("The provisions of this subchapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."); *see also Griggs v. E.I. DuPont de Nemours & Co.,* 237 F.3d 371, 378 (4th Cir. 2001) ("When a cause of action under state law is 'premised on' the existence of an employee benefit plan so that 'in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists,' ERISA preemption will apply.") (internal citation omitted).

As discussed, ERISA is a "'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system," which governs most employee benefit plans in the United States. *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251, (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 361 (1980)); *see Bellon,* 2022 WL 2760764, at *6 ("ERISA is designed to, inter alia, protect 'the interests of participants in employee benefit plans and their beneficiaries.'") (quoting 29 U.S.C. § 1001(b)). Within ERISA's "carefully crafted and detailed enforcement scheme," *Mertens,* 508 U.S. at 254, is the private right of action under which Schkloven has brought suit, ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B).

The Counterclaim seems to implicate ERISA § 502(a)(3), codified at 29 U.S.C. § 1332(a)(3). This provision authorizes a civil action "by a participant, beneficiary, or fiduciary" of an employee benefit plan "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress

such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3). Notably, the Supreme Court has "interpreted the term 'appropriate equitable relief' in § 502(a)(3) as referring to 'those categories of relief' that, traditionally speaking (*i.e.,* prior to the merger of law and equity) 'were *typically* available in equity.'" *CIGNA Corp. v. Amara,* 563 U.S. 421, 439 (2011) (emphasis in original) (citations and some internal quotation marks omitted).

In other words, a plan fiduciary, such as Hartford, can obtain relief under ERISA § 502(a)(3) only insofar as the remedy sought is equitable in nature. And, "whether the remedy a [plan fiduciary] seeks "'is legal or equitable depends on [(1)] the basis for [the fiduciary's] claim and [(2)] the nature of the underlying remedies sought.'" *Montanile v. Bd. of Trs. Of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (quoting *Sereboff v. Mid Atlantic Medical Services, Inc.,* 547 U.S. 356, 363 (2006) (some alterations in *Montanile*)).

Notably, "[a]n ERISA plan creates an equitable lien by agreement when, under the terms of the plan, one party agrees 'to convey a particular fund to another party.'" *Arrington v. Sun Life Assur. Co. of Canada*, TDC-18-0563, 2019 WL 2571160, at *14 (D. Md. June 21, 2019) (quoting *Montanile*, 577 U.S. at 143). The Policy empowers Hartford to recover for overpayments caused by the failure to deduct "Other Benefit Payments" from a benefit calculation. ECF 14-1 at 22. "Other Income Benefits" is defined to mean "the amount of any benefit for loss of income, provided to [the claimant] or [the claimant's] family, as a result of the period of Disability for which [the claimant] is claiming benefits under The Policy," including SSD Benefits. *Id.* at 25.

The parties do not dispute that plaintiff executed an agreement to reimburse Hartford for the award of SSD Benefits that give rise to an overpayment. *See* ECF 22-1 at 19; ECF 14-6 at 37-38. Thus, as I see it, Hartford's claim has an equitable basis. *See Arrington*, 2019 WL 2571160, at *14.

However, "'the nature of the underlying remed[y] sought'" must also be equitable. *Sereboff*, 547 U.S. at 363 (quoting *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)). The Supreme Court has explained that the remedy is equitable where a plan fiduciary seeks to recover specifically identifiable funds to which it is entitled under the plan, and such funds are in the actual or constructive possession of the defendant beneficiary. *See Sereboff*, 547 U.S. at 360-63 (finding that a plan fiduciary could seek reimbursement of the proceeds of a settlement where the relevant funds were held in an investment account, distinguishable from the beneficiaries' general assets); *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 93, 95 (2013) (providing that a plan fiduciary could seek relief from a plan beneficiary where some of the relevant funds were held in escrow and the remainder was identifiable and within the beneficiary's possession). In contrast, the Supreme Court has determined that a plan fiduciary could not obtain reimbursement pursuant to ERISA § 502(a)(3) where the funds in question had been disbursed to a trust and thus were not within the beneficiary's possession. *See Knudson*, 534 U.S. at 212-14.

In *Montanile*, 577 U.S. 136, the Supreme Court reiterated that ERISA § 502(a)(3) does not authorize a plan fiduciary to "enforce an equitable lien against a [beneficiary's] general assets." *Id.* at 148. According to *Montanile*, a plan fiduciary can "enforce an equitable lien only against specifically identified funds that remain in the [beneficiary's] possession or against traceable items that the [beneficiary] purchased with the funds (*e.g.*, identifiable property like a car)." *Id.* at 144-45. In contrast, a beneficiary's "expenditure of the entire identifiable fund on nontraceable items (like food or travel) [would] destroy[ ] an equitable lien." *Id.* at 145. In the latter circumstance, the plan fiduciary "may have a personal claim against the defendant's general assets—but recovering out of those assets is a *legal* remedy, not an equitable one." *Id.* (emphasis in *Montanile*).

As noted, the Counterclaim is styled as a claim for breach of contract.  *See* ECF 7 at 5-7. This casts doubt upon the proposition that the relief sought by Hartford is equitable in nature, as actions for breach of contract, generally speaking, seek legal remedies, rather than equitable ones. *See Unum Life Ins. Co. of America v. Pittman*, WDQ-14-1442, 2014 WL 6835676, at *4 (D. Md. Dec. 2, 2014) (finding that a fiduciary's breach of contract claim should be dismissed "[b]ecause ERISA permits fiduciaries only to bring actions for equitable relief"); *but see Sereboff*, 547 U.S. 360-63 (finding that although the plan fiduciary "alleged breach of contract and sought money," the relief sought was nonetheless equitable as the fiduciary sought to impose "a constructive trust or equitable lien on a specifically identified fund, not from the [beneficiaries'] assets generally, as would be the case with a contract action at law").

The information provided to the Court indicates that plaintiff was awarded monthly SSD Benefits between January 2018 and June 2018.  ECF 24-1.  Hartford has not shown whether Schkloven has retained the SSD Benefits awarded to him; whether the SSD Benefits are held separately from or are otherwise commingled with Schkloven's general assets; or whether Schkloven has spent the funds on traceable or nontraceable items.  In the absence of such information, I cannot discern whether the relief sought is equitable in nature and thus whether ERISA § 502(a)(3) authorizes the Counterclaim.  *See Arrington*, 2019 WL 2571160, at *15 (denying motion for summary judgment in absence of similar information); *accord Retirement Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) ("To establish a right to equitable restitution under ERISA, claimants must show that they seek to recover property that (1) is specifically identifiable, (2) belongs in good conscience to the plan, and (3) is within the possession and control of the defendant.").

**2.**

In any event, even assuming that the relief sought is authorized by ERISA § 502(a)(3), Hartford would not be entitled to summary judgment as to the Counterclaim.  This is because Hartford has not presented evidence to demonstrate that it is entitled to recover overpayments from plaintiff.

Hartford contends that under the Policy it "has the right to recover any overpayment of benefits paid to an insured, including retroactive awards of Other Income Benefits such as SSD benefits."  ECF 22-1 at 19.  Further, Hartford maintains that "Plaintiff was well aware of this fact, as it was communicated in Hartford's original award of LTD benefits," and Schkloven "signed an agreement in which he pledged to reimburse Hartford for any overpayment . . . ."  *Id.*  And, defendant asserts that plaintiff received an award of SSD Benefits, but plaintiff has refused to reimburse Hartford, as requested.  *Id.* at 2; *see* ECF 24-1.

Plaintiff contests defendant's argument in the space of a single paragraph.  *See* ECF 23 at 7.  He maintains that Hartford's contention is misplaced because "there is nothing in the administrative record which documents Schkloven's award of Social Security benefits, the amount of benefits which Schkloven received during the period that Schkloven received or may be entitled to receive benefits under the Hartford disability policy, or Hartford's calculation of the claimed overpayment amount."  *Id.*  And, Schkloven indicates that defendant neglected to include a copy of the SSA Determination with the Cross Motion.  *Id.*  Thus, in plaintiff's view, "Hartford has submitted insufficient evidence in support of its motion for summary judgment on its counterclaim."  *Id.*

To review a claim for the wrongful termination of benefits under 29 U.S.C. § 1132(a)(1)(B), the district court is, broadly speaking, limited to the record that was before the plan

fiduciary at the time it rendered the contested decision.  *See Helton*, 709 F.3d at 353-54.  But, as explained above, the Counterclaim is seemingly predicated on 29 U.S.C. § 1132(a)(3), not § 1132 (a)(1)(B).

Notably, the SSA Determination was not issued until July 30, 2018 (ECF 24-1 at 2), approximately four months *after* Hartford made its final decision to terminate plaintiff's LTD benefits.  *See* ECF 14-2 at 3-6.  In reviewing an action for the recovery of overpayments, a court may, in circumstances like those present here, consider evidence that was not before a plan fiduciary at the time it rendered a decision regarding a claimant's eligibility for benefits pursuant to a benefit plan governed by ERISA.  *See Coffey v. Hartford Life & Acc. Insur. Co.*, 318 F.R.D. 320, 324 (W.D. Va. 2017) (allowing plan beneficiary to obtain discovery of material outside the administrative record for the purpose of advancing a claim brought pursuant to 29 U.S.C. § 1132(a)(3), "given the nature of the claim and the fact that it arose well after Hartford's benefit determination").

Moreover, Hartford makes clear that Schkloven was well aware of the content of the SSA Determination because "it was Plaintiff's counsel who provided [the SSA Determination] to [defense] counsel in the first place."  ECF 25 at 7 n.6.  Plaintiff has not called into question the authenticity of the SSA Determination.  Therefore, I shall consider it in resolving the Counterclaim.

Turning to the substance of the Counterclaim, the Policy establishes that Hartford has the right to recover for overpayments resulting from the failure to deduct "Other Benefit Payments" from a benefit calculation.  ECF 14-1 at 22.  And, "Other Income Benefits" is defined to mean "the amount of any benefit for loss of income, provided to [the claimant] or [the claimant's] family, as a result of the period of Disability for which [the claimant] is claiming benefits under The

Policy," including disability benefits provided by the SSA. *Id.* at 25. The "Period of Disability" is defined to be the "continuous length of time during which [the claimant is] Disabled under The Policy." *Id.* at 16. Thus, the Policy empowers Hartford to recover overpayments resulting from Hartford's failure to deduct receipt of "Other Income Benefits" that the claimant receives "as a result of the Period of Disability" for which the claimant seeks LTD benefits from Hartford. ECF 14-1 at 25; *see id.* at 16, 22.

Plaintiff received monthly LTD payments from Hartford from August 5, 2017, through December 28, 2017. As of December 29, 2017, Hartford determined that plaintiff no longer qualified as disabled. *See* ECF 14-2 at 3-6, 41, 46. Thus, plaintiff's "Period of Disability" expired on December 28, 2017. ECF 14-1 at 16.

In the Award, Hartford informed plaintiff that it was calculating plaintiff's "LTD benefit rate without reduction by an estimated Social Security Disability Benefit." ECF 14-2 at 44. However, defendant instructed Schkloven to contact Hartford "when the Social Security Administration makes a decision on [his] application" for SSD Benefits. *Id.* And, Schkloven executed the Reimbursement Agreement, pursuant to which plaintiff assumed an obligation to repay Hartford in the event of overpayments resulting from his receipt of SSD Benefits. *See* ECF 14-6 at 37-38.

Plaintiff does not contest Hartford's argument concerning the import of the terms of the Policy. Neither does Schkloven take issue with Hartford's assertion that he signed an agreement to "reimburse Hartford for any overpayment of LTD benefits caused by an award of SSD benefits." ECF 22-1 at 19; *see* ECF 14-6 at 37-38. Moreover, plaintiff does not contradict Hartford's claim that he has refused to reimburse Hartford for overpayments that were provided to him.

However, the evidence does not establish that the SSD Benefits provided to plaintiff constitute "Other Income Benefits," as defined by the Plan. *See* ECF 14-1 at 25. The SSA Determination indicates that plaintiff received monthly SSD Benefits for the period between January 2018 through June 2018. ECF 24-1 at 2. But, as mentioned, plaintiff's "Period of Disability" under the Policy expired on December 28, 2017, *i.e.*, prior to the period in which plaintiff began to receive SSD Benefits. *See* ECF 14-2 at 5.

Nothing in the SSA Determination indicates that the SSD Benefits were retroactive or otherwise pertained to the "Period of Disability" for which plaintiff was provided LTD benefits by Hartford. To the contrary, the available evidence suggests that SSD Benefits were provided to plaintiff *after* his "Period of Disability" was terminated by Hartford. In other words, there is no evidence showing that plaintiff was double dipping.

Critically, Hartford does not provide any authority to support the claim that an award of SSD Benefits, effective for a period after the termination of a plaintiff's "Period of Disability," nonetheless qualifies as "Other Income Benefits." ECF 14-1 at 25. *Cf. Garcia v. The Hartford*, WDQ-11-0045, at *5-7 (D. Md. Jan. 31, 2012) (finding that the plan fiduciary was entitled to offset disability payments to account for SSD Benefits that had been provided to the claimant during the same months that the employee had also received disability benefits pursuant to the plan); *Peterson v. Int'l Paper Co.*, 7:06-CV-48-F, 2009 WL 3379922, at * 19-20 (E.D.N.C. Oct. 20, 2009) (determining the same based on similar language contained in an employee benefits plan). Thus, plaintiff's refusal to reimburse Hartford for the SSD Benefits recovered after the period of disability does not contravene the terms of the Policy. Even assuming ERISA § 502(a)(3) authorizes the relief sought in this case, Hartford has failed to demonstrate plaintiff's liability pursuant to the Counterclaim.

Notably, plaintiff has not moved for summary judgment as to the Counterclaim. Accordingly, I shall ask the parties to confer and submit a status report, joint if possible, advising the Court as to the status of the Counterclaim.[28]

## IV.    Conclusion

In light of the foregoing, I shall deny the Motion and I shall grant the Cross Motion in part and deny it in part.  In particular, I shall grant the Cross Motion with respect to plaintiff's claim for the wrongful termination of LTD benefits.  But, I shall deny the Cross Motion regarding the Counterclaim.

An Order follows.

Date: July 21, 2022                                                        _____/s/_____

                                                                              Ellen L. Hollander
                                                                              United States District Judge

---

[28] Of course, in light of the Court's decision to grant summary judgment to Hartford as to Schkloven's ERISA claim, Hartford may decide to forego its pursuit of the purported overpayments.